## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF WEST VIRGINIA

**JUAN MARGARIT SOSA,**

      **Plaintiff,**

**v.**                                           **Civil Action No. 5:17cv31**
                                                      **(Judge Stamp)**

**EDDIE ANDERSON, D.O.; RUTHIE
CARSON, RN; D. HERN, RN; ANDREA
SMITH-POSEY, RN; JOHANN LEHMANN,
P.A.; T. SAVIDGE, M.D., Clinical Director,
FCI Gilmer,**

      **Defendants.**

## <u>REPORT AND RECOMMENDATION</u>

On March 20, 2017, the *pro se* Plaintiff, an inmate then incarcerated at USP Atlanta[1] in Atlanta, Georgia, initiated this case by filing a <u>Bivens</u>[2] civil rights complaint against the above-named Defendants. ECF No. 1. Along with his complaint, Plaintiff filed a Motion for Leave to Proceed *in forma pauperis*, a Consent to Collection of Fees from Trust Account, and a copy of his Prisoner Trust Account Report ("PTAR") with its attached Ledger Sheets. ECF Nos. 2, 3, 4. By Order entered March 22, 2017, Plaintiff was granted permission to proceed as a pauper without payment of an initial partial filing fee, although he was assessed the full fee. ECF No. 6. By separate orders entered the same day, Plaintiff's medical records were sealed and the Clerk of Court was directed to correct the cause of action. ECF Nos. 7, 8.

---

[1] On August 22, 2017, Plaintiff filled out a Notice of Change of Address, reporting that he had been released from prison and was living in Georgia.  ECF No. 26.  On November 7, 2017, Plaintiff filed another Notice of Change of Address, advising that he is now residing in the Honduras. <u>See</u> ECF No. 32.

[2] <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971). Plaintiff filed his complaint on a court-approved form complaint for this district's civil rights cases arising under 42 U.S.C. § 1983, but it has been construed as a <u>Bivens</u> form complaint.  <u>See</u> ECF No. 8.

Thereafter, on April 5, 2017, Magistrate Judge James E. Seibert conducted a preliminary review of the complaint and entered an Order directing the Clerk to issue sixty (60)-day summonses to each defendant and to have the United States Marshal Service effect service on each. ECF No. 12.  On June 5, 2017, the Defendants moved for an extension of time and a consolidated response date.  ECF No. 19. By Order entered the same day, the motion was granted. ECF No. 20. On August 7, 2017, the Defendants moved for another extension of time. ECF No. 23.  By Order entered the next day, the second extension was granted. ECF No. 24.  On September 8, 2017, the Defendants filed a Motion to Dismiss or Alternatively, for Summary Judgment with a memorandum in support. ECF No. 27, 28. Because the Plaintiff was proceeding *pro se*, on September 12, 2017, Magistrate Judge James E. Seibert issued a <u>Roseboro</u>[3] notice, advising the Plaintiff of his right to file a response to the Defendants' dispositive motion. ECF No. 29.  On September 15, 2017, this case was reassigned from Magistrate Judge James E. Seibert to the undersigned.

Plaintiff did not file a response in opposition to the Defendants' dispositive motion.

Accordingly, this case is now before the undersigned for review, report and recommendation pursuant to LR PL P 2.

## I. <u>Contentions of the Parties</u>

### A.  <u>The Complaint</u>

In the complaint, Sosa raises a claim of deliberate indifference to serious medical needs, arising out of Defendants' alleged failure to provide adequate medical care after Sosa was attacked by another inmate at FCI Gilmer on March 10, 2014. Plaintiff contends he was kicked and stomped in the head, sustaining facial, head, and oral injuries, including facial fractures and a laceration requiring sutures. He alleges he was placed in the Special Housing Unit ("SHU")

---

[3] <u>Roseboro v. Garrison</u>, 528 F.2d 309, 310 (4th Cir. 1975).

after the attack, and then denied medical treatment and pain relief. He alleges that Defendants subsequently failed to send him to an outside oral/facial surgeon, permitting his injuries to heal incorrectly and leaving him with permanent facial deformity. Further, he contends that he sustained psychiatric injuries including anxiety, stress and panic attacks. ECF No. 1 at 7 – 9; see also ECF No. 1-1 through 1-18. Attached to his complaint are excerpts from Sosa's Bureau of Prisons ("BOP") medical records. See ECF Nos. 1-1 through 1-17.

The Plaintiff maintains that he has exhausted his administrative remedies with regard to his claims. ECF No. 1 at 4 - 5. He attaches copies of grievances filed. See ECF Nos. 1-18 through 1-30.

As relief, he requests compensatory damages in the amount of six million dollars ($6,000,000.00) against each of the Defendants and punitive damages of twelve million dollars ($12,000,000.00), costs and attorney fees, appointed counsel and a jury trial. Id. at 9.

## B. **The Defendants' Motion to Dismiss or Alternatively, for Summary Judgment**

The Defendants contend that the Plaintiff's complaint should be dismissed or summary judgment granted in their favor because

1) Plaintiff's complaint is untimely filed, even after allowing his attempts to administratively exhaust his claims prior to filing suit;

2) Plaintiff failed to exhaust his claims administratively prior to filing suit;

3) Plaintiff fails to plead and cannot establish a viable claim of deliberate indifference to serious medical needs;

3) the medical records demonstrate that Plaintiff received timely and appropriate medical and hospital care, but that Plaintiff refused to be seen by the outside medical providers whose visits were scheduled, and remained uncooperative with his treatment; and

4) because Plaintiff has not stated a constitutional violation, the defendants are entitled to qualified immunity.

ECF No. 28 at 8 – 21.

## II. <u>Standard of Review</u>

### A. <u>Motion to Dismiss</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs., Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993); <u>see also</u> <u>Martin</u>, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Twombly</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," <u>id.</u> (citations omitted), to one that is "plausible on its face," <u>id.</u> at 570, rather than merely "conceivable." <u>Id.</u> Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I. DuPont de Nemours & Co.</u>, 324 F.3d 761, 765 (4th

Cir. 2003) (citing <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 213 (4th Cir. 2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court, which has held that a "claim has factual plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. <u>Id.</u>

**B. <u>Motion for Summary Judgment</u>**

A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Motions for summary judgment impose a difficult standard on the moving party because it must be obvious that no rational trier of fact could find for the nonmoving party. <u>Miller v. Fed. Deposit Ins. Corp.</u>, 906 F.2d 972, 974 (4th Cir. 1990). In applying the standard for summary judgment, a court must review all evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u>, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as

to material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . .must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587 (citation omitted).

This Court is required to liberally construe *pro se* complaints. Erickson v. Pardus, 551 U.S. 89, 94 (2007); see also Haines v. Kerner, 404 U.S. 519, 520 (1972); Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978). Such *pro se* complaints are held to a less stringent standard than those drafted by attorneys. Erickson, *supra* at 94; Gordon v. Leeke, *supra* at 1151, and a federal district court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case. Hughes v. Rowe, 449 U.S. 5, 9 (1980); Cruz v. Beto, 405 U.S. 319 (1972).  When a federal court is evaluating a *pro se* complaint, the plaintiff's allegations are assumed to be true. Erickson, 551 U.S. at 93 (*citing* Twombly, 550 U.S. at 555-56). Nonetheless, the requirement of liberal construction does not mean that the court can

6

ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court. See Weller v. Dep't. of Social Srvcs., 901 F.2d 387 (4th Cir. 1990); see also Ashcroft v. Iqbal, 556 U.S. 662 (2009)(outlining pleading requirements under Rule 8 of the Federal Rules of Civil Procedure for "all civil actions"). The mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so; however, a district court may not rewrite a complaint to include claims that were never presented, Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999), construct the plaintiff's legal arguments for him, Small v. Endicott, 998 F.2d 411 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court, Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). Finally, although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. Randall v. United States, 95 F.3d 339 (4th Cir. 1996). See also Dunbar Corp. v. Lindsey, 905 F.2d 754, 764 (4th Cir. 1990).

### III. Analysis

#### A. Factual History of Plaintiff's Injuries and Treatment

A review of the medical records provided by the parties indicates that Sosa was first seen by Defendant Eddie Anderson D.O. ("Anderson") at FCI Gilmer's Health Services on March 10, 2014, at 11:30 a.m., after being involved in an assault on the compound.  ECF No. 28-2 at 13. Anderson describes Plaintiff as "very selective in answering questions, even when given in Spanish; won't say what happened; does concur that pain is limited to face, mouth, and left eye area, doesn't answer further questions about the nature of the injury or tetanus status, does give verbal consent for suturing after counseling." Id. Sosa's assessed visible injuries were

> LEFT lateral face/orbital swelling and contusion, EOMI intact,[4] Pain left upper pre-molar, no fracture or loose tooth apparent, pain with left TMJ/mandible but no overt deformity/dislocation with the limited amount of cooperation; RIGHT upper lip laceration, mid attachment @ VMB[5] that appears to be prior scar tissue, approx. 1 inch on inside with some active bleeding, approx. 1 cm outside VMB.

Id. (all errors in abbreviation, punctuation, and spelling in original). Anderson cleaned and irrigated the wound and sutured the laceration, using 1% lidocaine without epinephrine for anesthesia. Id. at 15. A March 17, 2014 follow up visit for suture removal was scheduled. Id. Ice was ordered to be applied to the area; Sosa was scheduled for a return visit, and counseled on the plan of care. Id. at 15 - 16. Sosa was also seen by Defendant Andrea Smith-Posey RN ("Smith-Posey") at 11:46 a.m., who noted that Sosa did not speak English and refused to respond to staff's attempts to communicate with him. Id. at 9. She documented that Sosa's pupils were equal and reactive to light, and he had a large right upper lip laceration, at which the bleeding had been controlled, as well as a swelling and abrasions to the left temporal area and above the right eye with no bleeding. Id. She noted that Dr. Anderson evaluated Sosa and sutured the lip; that Sosa's tetanus shot was updated; that he was in no acute distress; and that there was no blood inside his ears. Id. At 12:35 p.m., panorex x-rays of Sosa's jaws were performed in the dental clinic to rule out fractures. Id. at 18. At 12:42 p.m., Sosa was given an injection of 60 mg of a non-steroidal anti-inflammatory drug ("NSAID"), Toradol (ketorolac) for pain by Defendant Physician's Assistant Johanna Lehmann ("Lehmann"); an x-ray of the facial bones was ordered; and a follow up visit for that evening was scheduled. Id. at 19.

---

[4] "EOMI intact" is the medical abbreviation for "extraocular movements intact."

[5] "VMB" is an abbreviation for the "vermilion border," the normally sharp demarcation between the lip and the adjacent normal skin. Because the skin of the face is thicker than the skin overlying the lips, where blood vessels are closer to the surface, the lips have a redder color than the adjacent skin. Therefore, close attention must be given when repairing any injury to the vermilion border, because even 1 mm of vermilion misalignment could be noticeable.

Sosa was seen again at 8:00 p.m. that day by Defendant D. Hern, RN ("Hern"), who noted that although Sosa did not appear to be in acute distress, he did appear to be in pain, and had swelling, tenderness, and bruising around his left eye, which was so tightly swollen shut that the left pupil could not be assessed; his entire upper lip was swollen, more prominently on the right side; he had a sutured laceration to the upper lip; but that he was calm, conscious, not confused, and had a normal gait. Id. at 21 – 22.  Sosa was instructed to follow up at sick call as needed and to return immediately if his condition worsened. Id. at 23.

Sosa was evaluated again at 8:44 a.m. the next day by Defendant Ruthie Carson RN ("Carson"), who noted that while Sosa did not speak English, he did say "dolor" ("pain" in Spanish) and reported that his pain was a "9" on a scale of 1 – 10. Id. at 27. His vital signs were stable, and he had decreased range of motion in his jaw, facial asymmetry, facial and periorbital swelling, bruising, and tenderness. Id. at 27 – 28. His right pupil was equal and reactive to light but the left one could not be assessed because there was still so much swelling, the eye could not be opened. Id. at 28. Facial x-rays were performed. Id. Sosa was also seen by Defendant Dr. Todd Savidge ("Savidge"), who documented the same injuries Carson noted, and additionally noted that Sosa reported that he had developed dizziness, nausea and vomiting during the night, but that he had no double vision and had stable vital signs. Id. at 31 – 32.  Sosa's facial x-rays revealed a left zygomatic fracture[6] and cloudiness in the left maxillary sinus, for which a CT scan was recommended. Id. at 35. Arrangements were made to transfer him to Stonewall Jackson Memorial Hospital ("SJMH") in Weston, West Virginia for head injury evaluation, possible ear/nose/throat ("ENT") consultation, and admission, if indicated. Id. at 33.

---

[6] A zygomatic fracture is a fracture of the zygomatic arch, bridge of bone extending from the temporal bone at the side of the head around to the maxilla (upper jawbone) in front and including the zygomatic (cheek) bone as a major portion.  See   Zygomatic Arch, *available at* < https://www.britannica.com/science/zygomatic-arch >

However, SJMH apparently referred Sosa to West Virginia University's ("WVU") Ruby Memorial Hospital ("RMH") in Morgantown the same day, where he was admitted.  Id. at 39 - 41.  A CT scan of the brain was positive for facial fractures; CT scans of the cervical spine, chest, abdomen, and pelvis were negative for trauma; and a CT of the face was positive for left lateral orbital wall fracture, left maxillary sinus fracture, and left zygomatic arch fracture. Id. at 41. A left knee x-ray was negative for trauma. Id. Sosa was also diagnosed with a mild concussion; he apparently reported that he had been hit in the face with something that could have been a fist or a weapon, fell to the ground and lost consciousness, but then got up and was walking around afterwards, and later, began vomiting during the night.[7] Id.

Oral/maxilla-facial surgery and ophthalmology were consulted for the facial/orbital fractures. Id. at 42. Sosa was discharged the following day, March 12, 2014, after receiving Dilaudid (narcotic) as needed for pain and being transitioned to Tylenol #3 (Tylenol with codeine, a narcotic), with a prescription for 30 tablets of that, to take two tablets every four hours as needed, Colace (stool softener) daily, a prescription for Augmentin (antibiotic) once every twelve hours for seven days, and instructions to continue with his regular medications. Id. at 39 – 40. He was advised to follow a liquid diet and increase to soft as able; wash his face with warm soapy water; avoid smoking; avoid sunlight for the first two months, and to use sunscreen when outdoors. Id. at 40. A follow up visit with a trauma surgeon was scheduled for two weeks; a follow up visit with an oral surgeon was scheduled in one week; and a follow up visit with an oculoplastic surgeon was scheduled in two weeks. Id. at 41.  He was given detailed discharge instructions for the care of all of his injuries.  Id. at 46 - 51.

---

[7] Sosa's Glasgow Coma Scale ("GCS") was 15 on arrival at RMH, indicating a very mild concussion. ECF No. 28-2 The GCS is a system used to describe the level of consciousness in a person following a traumatic brain injury. See What is the Glasgow Coma Scale? *available at*  < https://www.brainline.org/article/what-glasgow-coma-scale >

A March 13, 2014 FCI Gilmer BOP Health Services Clinical Encounter Administrative Note indicates that Sosa "went straight to SHU upon return from WVU Ruby [RMH]." Id. at 52. He was assessed by PA Lehmann at 3:30 p.m. that day and was prescribed ibuprofen 800 mg three times daily as needed and continued on the Augmentin and Colace. Id.  PA Lehmann noted that Sosa had follow up visits scheduled with WVU oral surgery and trauma surgery on March 24, 2014 and with WVU oculoplastic surgeons in two weeks, and that he would be seen in the SHU again on March 18, 2014. Id. at 53. Sosa was seen by Andrea Hall RN at 4:15 p.m. that day, who noted that Sosa was being "seen after returning last night from outside hospital." Id. at 55.  She noted that his pupils were equal and reactive to light; his left temporal area was abraded and swollen; his left eye was swollen and red; and that his medications were given as ordered. Id. A lactose-free soft diet was ordered. Id. at 58.

On March 18, 2014, a clinical encounter by PA Lehmann was performed in the SHU with Sosa's cellmate acting as interpreter. Id. at 59.  Sosa indicated that he was "OK" but was worried about getting in touch with his family to let them know about his upcoming surgery; Lehmann tried to reassure him that she would do what she could to contact his family before the surgery. Id. Sosa did not appear to be in pain; he appeared well and was alert and oriented. Id. Lehmann noted that his facial bruising and swelling were greatly improved, as was the swelling around the upper lip. Id. She continued his ibuprofen for four more days. Id. at 60.

On March 20, 2014, when it was time to keep the appointment with the WVU oral/maxilla-facial surgeon, for reasons that are not explained in the record, Sosa refused to go, and refused to sign the Medical Treatment Refusal Form advising him that the risks of refusing treatment were misdiagnosis, infection, improper/delayed healing of facial injuries as a result of assault.  Id. at 63.

11

On April 2, 2014, Sosa submitted a FCI Gilmer Health Services Medical Sick Call Triage Form in Spanish, complaining about being unable to tolerate dairy products or foods made with those ingredients and being given nothing as a substitute. Id. at 66. PA Lehmann forwarded a copy of the form to food services via email. Id. Sosa filled out another (undated) FCI Gilmer Health Services Medical Sick Call Triage Form, this time in English, indicating his wish to change his soft diet to a regular non-dairy diet. Id. at 67. A response to the request was provided on April 7, 2014, indicating that the change had been made. Id. at 67 – 68.

On March 8, 2014, at a 2:23 p.m. Health Services Clinical Encounter performed in the SHU by PA Lehmann, Sosa was again seen at his cell door with his cellmate acting as interpreter. Id. at 69. Lehmann noted that

> [t]his is a f/u [follow up] re pt's assault injuries and INH[8] tx [tx = treatment]. Pt was begun on INH and has had no significant SE [side effect] as a result. Pt reports he is doing better – requested to be changed back to his nl dairy free diet – no longer mushed up.  Pt also states that his left jaw is still sore but ROM [range of motion] is greatly improved. Pt's left eye tears a lot.  Pt reports he is not sleeping well at night r/t/ [related to] nightmares and waking suddenly – pt reports he has not talked to psychology but would like to.
>
> **Discussed fact that pt refused his f/u visit @ WVU r/t his trauma and that he really needs to reconsider that – regardless if he gets to talk to his family or not. The long term effects could be pretty significant and I'm sure his family would want him to do what the doctors recommend for his health.  This is translated to pt and he agrees to the f/u appt; will resubmit request**.
>
> Pt other concern r/t itching between toes – has been drying super good there after showers but it is not getting better. Pt is indigent & requests tx.

Id. (all medical abbreviations, spelling and punctuation errors in original; emphasis added). Lehmann further noted that Sosa's mood was impaired, although pleasant and cooperative, he seemed moderately anxious, was suffering from panic attacks and sleep impairment and seemed

---

[8] Isoniazid is an antibiotic used with other medications to treat active tuberculosis (TB) infections. It is also used alone to prevent active TB infections in people who may be infected with the bacteria (people with positive TB skin test).  See I.N.H. Tablet, *available at* < https://www.webmd.com/drugs/2/drug-52765/i-n-h-oral/details >

paranoid/guarded/suspicious. Id. at 69 – 70. Sosa's facial wounds appeared to be well-healed but the skin between his toes appeared macerated. Id. at 70. She diagnosed him with tinea pedis (athlete's foot) and ordered an antifungal cream to treat it, as well as amitriptyline[9] 25 mg daily at bedtime for six months. Id. at 70 – 71. She also continued his ibuprofen again for seven more days. Id. at 71. She put in a request for WVU oral surgery follow up for Sosa's facial fractures and notified the psych department that Sosa appeared to be experiencing symptoms of post-traumatic stress disorder ("PTSD") and would like to speak to psychology. Id. Sosa signed a Consent to Use of Tricyclic Antidepressant Medication the same day. Id. at 74.

Sosa was seen on April 23, 2014 in Health Services for a medication renewal/review of his calcium prescription. Id. at 75. As disposition of the issue, PA Lehmann renewed the prescription and noted that Sosa would be "Placed on Callout." Id.

On May 2, 2014, Sosa submitted a FCI Gilmer Health Services Dental Sick Call Triage Form, complaining about having had a toothache for two months. Id. at 77. He was placed on the wait list and advised to for "watch call-outs" the same day. Id. at 77.

On May 6, 2014, while in the SHU, Sosa had a Clinical Encounter follow up visit from PA Lehmann to monitor his INH treatment and facial injuries; he was seen through his cell door with his cellmate acting as interpreter. Id. at 81.  He appeared well, was pleasant, cooperative, alert and oriented, reported feeling "OK" and denied problems with the INH, his appetite, and/or any gastrointestinal or genitourinary symptoms. Id. He reported that he still had deep bone facial pain and asked for medication to relieve it. Id. He reported that the amitriptyline was not helping and might be making things worse, because he was still waking with nightmares and felt anxious throughout the day. Id. He denied having spoken with psychology recently. Id. He reported

---

[9] Amitriptyline is a tricyclic antidepressant used to treat depression and mood disorders, improve feelings of well-being, relieve anxiety and tension, aid in sleep, and increase energy level.  See  Amitriptyline HCL *available at* < https://www.webmd.com/drugs/2/drug-8611/amitriptyline-oral/details >

constipation despite sufficient water intake. Id. He also reported bleeding in his upper right gums; he was instructed to gently brush the area; swish afterwards with warm salty water; and to submit a request to be seen by dental. Id. His ibuprofen was again continued, at 600 mg, three times daily, and he was prescribed 90 tablets; Prozac 20 mg daily was begun and the amitriptyline was discontinued. Id. at 82 – 83. He was instructed to follow up at sick call and chronic care as needed, and counseled on access to care, his new medication, and the plan of care, and he verbalized understanding. Id. at 83.

On May 30, 2014, after reporting via a "cop out" that he was having toothaches, Sosa refused to be brought over from the SHU to the dental clinic for examination, x-ray, and treatment. Id. at 85.  He was advised by the dentist, both verbally and in writing, via a Medical Treatment Refusal form, that he faced possible consequences of pain, swelling, infection, abscess, cellulitis, loss of tooth, hospitalization, and/or death by refusing treatment. Id.  He refused to sign the form. Id. at 85 – 86.

Sosa was transferred out of FCI Gilmer on June 10, 2014, before the rescheduled appointment with a local oral surgeon took place.  ECF No. 28-2 at 7.  It is unclear from the record whether Sosa ever had any of the follow-up appointments with outside medical providers rescheduled, once he arrived at the subsequent facilities to which he was sent,[10] before he was released from custody on August 18, 2017. See Declaration of Sharon Wahl, Paralegal, Beckley Consolidated Legal Center ("Wahl Decl."), ECF No. 28-1, ¶9 at 2.

**B. Timeliness of the Plaintiff's Complaint and Exhaustion of Administrative Remedies**

---

[10] Sosa was transferred first to USP Atlanta, arriving there on June 11, 2014 and remained there until June 25, 2014. He was then sent to FCI Edgefield in Edgefield, South Carolina, from June 25, 2014 through January 28, 2015.  He returned to USP Atlanta on January 28, 2015 and remained there till February 4, 2015, when he was sent to FCI Williamsburg in Salters, South Carolina, from February 4, 2015 through August 14, 2015.  He returned to USP Atlanta that same day, and remained there until he was released from custody on August 18, 2017. Wahl Decl., ECF No. 28-1, ¶ 9 at 2.

The Defendants argue that the Plaintiff's complaint should be dismissed because it is untimely. ECF No. 28.  Plaintiff did not file a response in opposition to Defendants' dispositive motion.

"State law supplies the statute of limitations applicable to <u>Bivens</u> actions." <u>Noll v. Getty</u>, 995 F.2d 1063 at *2 n.2 (4th Cir. 1993) (citations omitted).  West Virginia Code § 55-2-12 provides that "[e]very personal action for which no limitation is otherwise prescribed shall be brought . . . (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries." Therefore, a two-year statute of limitations applies here.

"Under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." <u>Nasim v. Warden, Maryland House of Correction</u>, 64 F.3d 951, 955 (4th Cir. 1995). The Plaintiff undoubtedly possessed sufficient facts to learn of his cause of action in March 10, 2014, when he was first injured. However, "the prisoner is entitled to equitable tolling of the applicable limitations period while he [exhausts administrative] remedies." <u>Young v. Thompson</u>, No. 2:10-CV-66, 2011 WL 3297493, at *4 (N.D. W.Va. July 29, 2011) (citations omitted).

The Bureau of Prisons provides a four-step administrative process beginning with attempted informal resolution with prison staff (BP-8). If the prisoner achieves no satisfaction informally, he must file a written complaint to the warden (BP-9), within 20 calendar days of the date of the occurrence on which the complaint is based. If an inmate is not satisfied with the warden's response, he may appeal to the regional director of the BOP (BP-10) within 20 days of the warden's response. Finally, if the prisoner has received no satisfaction, he may appeal to the Office of General Counsel (BP-11) within 30 days of the date the Regional Director signed the response. An inmate is not deemed to have exhausted his administrative remedies until he has

filed his complaint at all levels.  28 C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F.Supp. 941, 943 (D.Md. 1997).

In Jones v. Bock, 549 U.S. 199 (2007), the United States Supreme Court ruled, among other things, that an inmate's failure to exhaust under the PLRA is an affirmative defense, and an inmate is not required to specifically plead or demonstrate exhaustion in his complaint. Nonetheless, pursuant to the Court's authority under 28 U.S.C. § 1915, it not foreclosed from dismissing a case *sua sponte* on exhaustion grounds, if the failure to exhaust is apparent from the face of the complaint.  See Anderson v. XYZ Corr. Health Servs., 407 F.3d 674, 681 – 82 (4th Cir. Va. 2005).

Under § 1997e(a), the exhaustion requirement depends on the "availab[ility]" of administrative remedies: An inmate must exhaust available remedies, but need not exhaust unavailable ones." Ross v. Blake, 136 S. Ct. 1850, 1858 (2016).  For example, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use, such as when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Ross, 136 S. Ct. at 1859. Or, a remedy might be rendered unavailable because prison administrators thwart inmates from taking advantage of it "through machination, misrepresentation, or intimidation." Ross, 136 S. Ct. at 1860.

Finally, where exhaustion is not apparent from an inmate's pleading, "a complaint may be dismissed on exhaustion grounds so long as the inmate is first given an opportunity to address the issue." Custis v. Davis, 2017 U.S. App. LEXIS 5147 (4th Cir. 2017)(quoting Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

Plaintiff contends he exhausted his administrative remedies in this matter. Defendants dispute this. After a careful review of the record, the undersigned agrees that Plaintiff did not, in fact, complete the exhaustion process.

As a preliminary point, as noted *supra*, if a prisoner cannot satisfactorily resolve an issue after filing a BP-8 request for informal resolution, he must file a written complaint to the warden (a BP-9), within 20 calendar days of the date of the occurrence on which the complaint is based. Sosa's injuries were incurred on March 10, 2014; liberally construing Sosa's pleadings as required, given that Sosa is effectively alleging a continuous pattern of inadequate care at FCI Gilmer, even assuming the June 10, 2014 date he left FCI Gilmer as the end date of FCI Gilmer's deliberate indifference to those injuries, Sosa should have filed his BP-9 by June 30, 2014, at the very latest.  However, it is apparent from the record that Sosa alleges he began the grievance process by filing a BP-9 on September 17, 2015; Defendants contend the grievance process was initiated on November 30, 2015, when they received the BP-10 Sosa filed on November 23, 2015. Regardless, under either version of the events, Sosa was grossly untimely in beginning the grievance process by waiting well over a year to initiate it. Nonetheless, because the BOP did not reject his grievances as untimely, they will not be construed as untimely-filed here. "If a prison accepts a belated filing, and considers it on the merits, that step makes the filing proper for purposes of state law and avoids exhaustion, default, and timeliness hurdles in federal court." Ross v. County of Bernalillo, 365 F.3d 1181, 1186 (10th Cir. 2004).

Based on the copies of grievances attached to his complaint, it appears that Sosa first filed a BP-8 on August 20, 2015 [see ECF No. 1-23] with "H. Persimmon, Assistant Health Service Administrator" regarding the denial of adequate medical care for his March 10, 2014 injuries; it was apparently received the same day. ECF No. 1-18. A copy of that BP-8 was not

produced; only Persimmon's August 27, 2015 response to it, which states that Plaintiff did receive timely and appropriate medical care for his injuries but that Plaintiff subsequently refused the March 20, 2014 follow up appointment with the oral/maxilla-facial surgeon. Id. There is a type-written note at the bottom, apparently added by Sosa after he received Persimmon's response, disputing the fact that Sosa refused the follow-up appointment. Id.

Sosa also produced a copy of a September 17, 2015 Request for Administrative Remedy (BP-9) complaining about the denial of medical care [ECF No. 1-19]; however, the bottom half of the page, for "Part B – Response" by the Warden is blank and unsigned [id.], which raises the inference that it may never have been submitted.[11] Id.

Sosa also produced a copy of an October 22, 2015 Inmate Request to Staff (BP-8) addressed to "Mr. K. Houston, Counselor," wherein he complained of having not received any response from the Warden regarding the BP-9 he contends he submitted on September 17, 2015. ECF No. 1-21. However, again, the bottom half of the page marked for "Disposition" by the responding staff member is completely blank and unsigned [id.], raising the question of whether in fact it was ever submitted.

Sosa also produced a copy of an October 27, 2015 Inmate Request to Staff (BP-8), again addressed to Mr. K. Houston, Counselor, complaining again of not having received any response from the Warden to his BP-9. ECF No. 1-22. This document does have a November 15, 2015 response at the bottom; under "Disposition," K. Houston wrote "[t]here is [sic] no

---

[11] While a BP-8 informal remedy varies from institution to institution, and is generally a single-page document, each of the BOP forms BP-9, BP-10, and BP-11 are formal, quadruple-copy forms that are uniform throughout all BOP facilities; they each have an original "face" page plus three copies. All pages of BP-9 forms are blue; all pages of BP-10 forms are yellow; and all pages of BP-11 forms are pink. Further, each page of each form includes a directive at the bottom left corner, explaining what is to be done with that particular page/copy.

The copy of this BP-9 produced by Sosa is the "face" or original page, and is marked "Original: Return to Inmate." Normally, the Warden completes his "Part B" response at the bottom half of the page, and then returns the completed "original" (face) page, as well as the "Second Copy" and "Third Copy" to the inmate. That way, the inmate has a copy to keep, and a copy to append to his BP-10 and BP-11 as is required, if he is dissatisfied with the Warden's response and chooses to continue on in the next levels of the appeal process.

Remedy/Data/Administrative Remedy receipts for you." Id. This seems to support the inference that Sosa's BP-9 had not, in fact, ever previously been submitted.

Sosa then produced a copy of a Regional Administrative Remedy Appeal (BP-10), dated November 23, 2015, in which he states that he was filing a BP-10 because he submitted a BP-8 on August 20, 2015; received a response which misrepresented the facts on August 27, 2015; and that he submitted a BP-9 on September 17, 2015, but that to date, he had yet to receive any response to it from the Warden, and therefore, he was proceeding with his BP-10 Regional Administrative Remedy Appeal. ECF No. 1-23.  He contended that the subject of the grievance was the Correctional Officers' failure to protect him from attack by other prisoners.[12] Id.  On November 30, 2015, he received a Remedy ID 843780-R1 Rejection Notice from the Administrative Remedy Coordinator at the Southeast Regional Office, advising him that his regional appeal was being returned to him because he was required to first file a BP-9 with the Warden at the institution before filing an appeal at that level.  ECF No. 1-24.

Sosa also produced a copy of an affidavit signed and dated on December 18, 2015; it is unclear what grievance to which it was originally attached.[13]  See ECF No. 1-25. In it, he declares that he filed his Regional Administrative Remedy Appeal (BP-10) on November 23, 2015; it was rejected on November 30, 2015, on the grounds that he had to file first a BP-9 Request for Administrative Remedy; he did not receive the BP-10 rejection notice until Wednesday, December 16, 2015, sixteen days after it was issued and he questions whether "someone held it until a deadline passed." ECF No. 1-25 at 1. He argues that he did in fact file a

---

[12] The September 17, 2015 BP-9 Sosa claims he submitted did not raise any claim of failure to protect, only a denial of adequate medical care at FCI Gilmer. Likewise, in this Bivens action, Sosa does not raise any failure to protect claim.

[13] In his January 13, 2016 Central Office Administrative Remedy Appeal (Office of General Counsel) Sosa says that he submitted this December 18, 2015 affidavit to the Regional Director. See ECF No. 1-28.

BP-9, but that he never received a response from the Warden, and that when he filed his Regional Appeal (BP-10), that that was why the copy of the BP-9 he appended to the BP-10 was white, rather than the original blue it should have been, implying that he had made/kept his own copy of the BP-9 before submitting it. Id.

On December 28, 2015, Sosa received a Remedy ID 843780-R2[14] Rejection Notice from the Administrative Remedy Coordinator at the Southeast Regional Office, advising him that his regional appeal was being returned to him because he was required to first file a BP-9 with the Warden at the institution, before filing an appeal at that level.  ECF No. 1-27.

Sosa also produced a copy of a January 13, 2016 "Third Copy: Warden's Administrative Remedy File"[15] (BP-11), a Central Office Administrative Remedy Appeal (Office of General Counsel), in which he states he is appealing the Warden's "BP-8, BP-9 wrongdoings" and also the Regional Director's "disregard trying to boiler-play [sic]" his complaint against the Warden of FCI Gilmer for refusing to respond to his BP-9. ECF No. 1-28.  He contends that the Warden abused his authority by refusing to respond to his September 17, 2015 BP-9; that he appealed the Warden's malfeasance and inaction to the Regional Director on November 23, 2015, but the Regional Director rejected his appeal twice on the grounds that he had not first filed a BP-9. Id. He again references the fact that he included a white copy (of his own making) of what should have been the blue copy BP-9 (presumably because the Warden did not respond to his BP-9 and return the requisite blue copies), implying that the Regional Director failed to recognize it, because it was white.[16] Id. He referenced his December 18, 2015 affidavit and the November 30,

---

[14] The "R2" suffix on the Remedy ID number indicates it was a second attempt at that level.

[15] Sosa apparently submitted the third copy of the quadruple-copy BP-11, intended for the Warden's Administrative Remedy file.

[16] Sosa appears unaware that if a BP-9 is actually submitted, the "First Copy" is retained by the Warden for his own Administrative Remedy file, and that when an inmate alleges he did not receive a BP-9 response, the BOP checks to

2015 and December 28, 2015 Rejection Notices, indicating that they were attached. Id. The bottom half of the BP-11, intended for the "Part B" response by General Counsel, is blank and unsigned, although it appears that Sosa wrote in the claim number at the bottom right. Id. As relief, on a continuation page, Sosa requested that "this complaint be investigated and corrected" to rectify the denial of his due process rights to relief. ECF No. 1-29.

On February 1, 2016, Sosa received a Rejection Notice from the Administrative Remedy Coordinator, Remedy ID 843780-A1, advising that his Central Office Appeal of his grievance regarding "other medical matters," received on January 21, 2016, was being rejected and returned to him. ECF No. 1-30.  He was advised that he had submitted his request or appeal to the wrong level, that the Administrative Remedy Coordinator concurred with the Regional Office's reason for rejection and that he should follow the directions provided on his prior rejections. Id. He was specifically advised that "[a] rejection is not a denial.  This issue must first be appealed at the institution. Follow regional directions and send to warden's first." Id.

Defendants contend that Plaintiff only ever filed three administrative remedies in this matter. The first, Remedy ID 843780-R1, was received at the BOP's Southeast Regional Office on November 30, 2015, and it alleged denial of medical attention at FCI Gilmer. See Wahl Decl., ECF No. 28-1, ¶ 12 at 4; see also ECF No. 28-1 at 15. This request was rejected because Sosa had submitted his request directly to a BOP Regional Office without first filing an institutional grievance to the Warden at his correctional facility using a BP-9 form as required by the BOP administrative process. Wahl Decl., ECF No. 28-1, ¶12 at 4.

Instead of filing the BP-9 with the Warden, Sosa resubmitted his grievance to the BOP Southeast Regional Office on December 28, 2015 as Remedy ID 843780-R2. See Wahl Decl.,

---

see if the copy is there; the Regional Director apparently did that; he did not reject because the appended copy of the BP-9 was white, rather than blue.

ECF No. 28-1, ¶13 at 4; <u>see also</u> ECF No. 28-1. The request was again rejected because Sosa had

not filed an institutional grievance (BP-9) as required by the BOP administrative process. Wahl

Decl., ECF No. 28-1, ¶13 at 4.

Sosa then appealed his request to the BOP General Counsel on January 21, 2016 using

Remedy ID 843780-A1. Wahl Decl., ECF No. 21-1, ¶ 14 at 4. This appeal was also rejected and

Sosa was provided with the following specific instructions: "[a] rejection is not a denial. This

issue must first be appealed at the institution. Follow regional directions and send to Warden's

first." Wahl. Decl., ECF No. 28-1, ¶ 14 at 4. Nonetheless, Sosa did not resubmit his request as

instructed, and he did not file any other formal BOP grievances while he was in BOP custody. <u>Id.</u>

¶¶ 14-15 at 4 - 5.

Although Sosa's September 17, 2015 Request for Administrative Remedy complains that

he was prevented from timely filing his grievances while in FCI Gilmer's SHU, that he requested

the necessary forms several times, and made "good faith efforts" to pursue his claims [ECF No.

1-19, ECF No. 1-20], that claim is not supported by the record.  Before Sosa was ever transferred

away from FCI Gilmer, while still in the SHU there, Sosa was able to submit a "copout"[17] i.e., an

Inmate Request to Staff (BP-8) on May 2, 2014 (an FCI Gilmer Health Services Dental Sick Call

Triage form) about a toothache [<u>see</u> ECF No. 28-2 at 77, 85], undermining his claim that FCI

Gilmer rendered the grievance process unavailable to him and prevented his timely exhausting

his administrative remedies.

Further, it is clear from the record that Sosa was released  from FCI Gilmer's SHU on

June 10, 2014, when, as noted *supra*, he first went to USP Atlanta from June 11, 2014  - June 25,

---

[17] "**Inmate Request to Staff Member.** An Inmate Request to Staff Member (form BP-S148), commonly called a
Cop-Out, is used to make a written request to a staff member. Any type of request can be made with this form. Cop-
outs may be obtained in the living units from the Correctional Officer on duty. Staff members will answer the
request within a reasonable period of time." <u>See</u> FCI Gilmer   Inmate Admission & Orientation Handbook, August
28, 2014, *available at* < https://www.bop.gov/locations/institutions/gil/GIL_aohandbook.pdf >

2014; then to FCI Edgefield in Edgefield, South Carolina, from June 25, 2014 through January 28, 2015; then back to USP Atlanta from January 28, 2015 through February 4, 2015; then to FCI Williamsburg in Salters, South Carolina, from February 4, 2015 through August 14, 2015; and then back to USP Atlanta, until he was released from custody on August 18, 2017. Wahl Decl., ECF No. 28-1, ¶ 9 at 2.  It does not appear that Sosa even attempted to begin the grievance process until two days after he arrived back at USP Atlanta in August, 2015, over fourteen months after he left FCI Gilmer and over nineteen months from the date of his March 10, 2014 injuries, thus, his confinement in FCI Gilmer's SHU had little, if any effect, on his attempts to timely file grievances.  Moreover, while the affidavit Sosa produced that presumably was attached to the November 30, 2015 rejection notice claims that

> I did file[] a BP-9 but The Warden's Office at FCI-Gilmer never returned an answer is why I submitted a white in color page in which is a copy of the original of the BP-9 Blue Page . . . When I filed to The Regional Office The [sic] BP-10 I explained that The Warden's Office at FCI-Gilmer never returned an answer to me. . . I think it was self-explained and is obvious that the Original Blue page BP-9 was not submitted to this Regional Office[]

ECF No. 1-25]. Even if true, as noted *supra*, the issue of Sosa's timeliness in initiating the grievance process is moot, given that the BOP accepted the late-filed grievances.

Had Sosa merely followed the instructions in the Rejection Notice's instruction to file a BP-9 with the Warden, he could have successfully completed the grievance process with his untimeliness in initiating it excused.  Instead, he repeatedly ignored the instruction, and resubmitted his grievance to the BOP Southeast Regional Office, where it was again rejected on December 28, 2015 as Remedy ID 843780-R2.  Sosa's BOP Administrative Remedy Generalized Retrieval documented grievance history began with the November 23, 2015 Regional Administrative Remedy Appeal (BP-10), received and denied at the Regional Office level on November 30, 2015. Despite his claims to the contrary, Sosa never filed a BP-9 at FCI

Gilmer, despite being repeatedly instructed to do so, and never successfully appealed to the Mid-Atlantic Regional Office  or to the Central Office (General Counsel), because his appeals to those levels were rejected.

The undersigned is cognizant that while a <u>Bivens</u> plaintiff pursues his administrative remedies, as he is obligated to do by the PLRA, the otherwise applicable statute of limitations is tolled. <u>Young v. Thompson</u>, No. 2:10cv66, 2011 WL 3297494 (N.D. W.Va. July 29, 2011)(citing <u>Johnson v. Lappin</u>, 2011 WL: 560459 (S.D. W.Va. Jan. 6, 2011)); <u>see</u> <u>Lopez v. S.C.D.C.</u>, No. 3:06251-PMD-JRM, 2007 WL 2021875 *2 (D.S.C. 2007) ("The Fourth Circuit has not addressed the issue of whether the statute of limitations for a § 1983 action[18] should be equitably tolled while a prisoner is exhausting the administrative process. However the 'uniform holdings of the circuits that have considered the question' typically tolls the statute of limitations.") *citing* <u>Brown v. Valoff</u>, 422 F.3d 926, 943 (9th Cir. 2005)).

Here, however, because Sosa never complied with the directives in the Rejection Notices, he did not *complete* the grievance process. Accordingly, consistent with <u>Custis v. Davis</u>, although Plaintiff has had the opportunity to address the issue, but he failed to avail himself of that opportunity by filing a response in opposition to the Defendants' motion.  Consequently, he is not entitled to tolling of the statute of limitation for the time spent in pursuing his administrative remedies, and his claims, filed two years, eight months, and ten days after the June 10, 2014 date when he left FCI Gilmer, are time-barred.  Even if Plaintiff's claims were not time-barred, it is apparent from the record that his claims of deliberate indifference to serious medical needs are not supported by the record.

## IV. <u>Recommendation</u>

---

[18] Case law under 42 U.S.C. §1983 is applicable to <u>Bivens</u> actions.  <u>See</u> <u>Butz v. Economou</u>, 438 U.S. 478, 504 (1978).

In consideration of the foregoing, it is the undersigned's recommendation that the Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment [ECF No. 27] be **GRANTED** and that Plaintiff's complaint [ECF No. 1] be **DENIED and dismissed with prejudice.**

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of Court is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record.

This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the Magistrate Judge's association with this case.

DATED: June 15. 2018

/s/ *Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE